OSCEOLA, CITY OF, Appellee, v. GJELLEFALD CONSTRUCTION COMPANY et al., Appellants.

No. 43888.

May 10, 1938.

Allen Loth, for appellants.

O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellee.

HAMILTON, J.—█ The solution of the question involved in this case calls for a construction of the "contractor's bond". By the terms of the bond, the specifications as well as the contract are by reference incorporated in the bond. In construing any instrument in writing the primary object is to arrive at what the parties to such instrument had in mind when it was prepared. 8 Amer. Jur., p. 722. In this case, the parties had in mind the construction of a dam, made out of earth, across a creek bed between two hills for the purpose of creating a reservoir from which the city would obtain its water supply. If it was to be of any use at all, it was necessary that the dam be so constructed as to hold water. An engineer was employed by the city who prepared plans and specifications detailing the material to be used and the way and manner in which the dam was to be built which gave the engineer broad authority in the supervision of the work and the selection of the material; but, as to the one absolutely essential feature, namely, water-tight construction, the responsibility was placed squarely upon the contractor by the specific provision found in the specifications, to wit: "The Dam shall be water-tight when finished, and the contractor shall assume entire responsibility for the obtaining of a water-tight structure."

The specifications also provided:

"Before final acceptance of the work, the same will be inspected by the engineer, the City Council, or water committee, and the work as installed must be found in compliance with the requirements of the plans and specifications. * * * Any defects of workmanship or materials revealed by such final inspection will be corrected and made good by the contractor before final acceptance of the work. A one year guarantee on workmanship, materials, equipment, machinery and appliances will be required in the contract."

These specifications were before the contractor when he made his bid. On October 9, 1933, the contract was entered into between the Gjellefald Construction Company and the City of

Osceola for the construction of this dam and in this contract the specifications are made a part of the contract and the contract contained the following provisions:

"First party also agrees to furnish within ten days after signing this contract an acceptable legal bond for 100% of the contract price guaranteeing complete and proper fulfillment of the Contract, and also providing a one year guarantee on the labor, materials of construction and mechanical equipment of said installations from date of acceptance by second party."

Following the execution of this contract, on the same date, a bond, designated "Contractor's Bond", with Gjellefald Construction Company as principal and Aetna Casualty & Surety Company as surety in the sum of $18,100 with the City of Osceola named as obligee, was executed. The material provisions of which are as follows:

"The condition of this obligation is such that whereas the principal, on October 9, 1933, entered into a contract with the City to construct an earthen dam as included in Division C of the plans and specifications for the City of Osceola, Iowa, as prepared by Lafayette Higgens, Jr., of Des Moines, Iowa, copy of which contract, together with all of its terms, covenants, conditions, and stipulations is incorporated herein and made a part hereof as fully and completely as if said contract were recited at length herein and

"Whereas, the principal and surety hereby agree to pay to all persons, firms, or corporations having contracts directly with the principal or with subcontractors, all just claims due them for labor performed or materials furnished, in the performance of the contract on account of which this bond is given, when the same are not satisfied out of the portion of the contract price which the public corporation is required to retain until completion of the public improvement, but the principal and sureties shall not be liable to said persons, firms or corporations unless the claims of said claimants against said portion of the contract price shall have been established as provided by law.

"Now, if the principal shall in all respects fulfill said contract according to the terms and tenor thereof, and shall satisfy all claims and demands incurred for the same, and shall fully indemnify and save harmless the Obligee from all costs and

damages which it may suffer by reason of failure to do so and shall fully reimburse and repay the Obligee all outlays and expenses which it may incur in making good any such default, then the obligation is to be void and of no effect; otherwise to remain in full force and effect.

"Every surety on this bond shall be deemed and held, any contract to the contrary notwithstanding, to consent without notice:

"1. To any extension of time to the contractor in which to perform the contract.

"2. To any change in the plans, specifications or contract, when such change does not involve an increase of more than twenty per cent (20%) of the total contract price, and shall then be released only as to such excess increase.

"3. That no provision of this bond or of any other contract shall be valid which limits to less than one year from the time of the acceptance of the work the right to sue on this bond for defects in workmanship or material not discovered or known to the Obligee at the time such work was accepted."

Work was commenced the latter part of October 1933, and completed in December 1933. The work was inspected by the engineer and on February 22, 1934, the final estimates for said improvement were made and a resolution passed by the city council which provided: " * * * That the improvement so constructed by the contractors above named be accepted and approved by the Council."

The dam, extending east and west between two hills across a watercourse, was 510 feet long and was 20 to 25 feet high with a spillway near the west end which was 5 feet lower than the top of the dam. On both sides of the spillway were built concrete walls which ran across through the dam. The water fall was toward the north, the reservoir situated south of the dam. The south slope of the dam was sheeted over with cement slabs 4 inches thick and 8 feet square, with expansion joints between them, and these slabs also extended over the spillway and down the north slope of the spillway portion of the dam. Because of the extreme drought which existed in that part of the state in 1934, the major portion of this structure was exposed above the water level until late in the fall of 1934. On July 7, 1934, there were 4 or 5 feet of water behind the dam covering

a surface of 15 or 20 acres; the water was 33 inches lower than the overflow at the spillway. At this time the city started to pump but in about three weeks the water got too low. In October 1934, the water had risen to a height of 6 or 8 feet. When the water got up to the spillway it started to run underneath the spillway due to the fact that the earth portion of the dam had settled away from the cement slabs and some of the slabs had fallen down and the water ran through these openings and seeped out on the north side of the spillway. On the 12th of September, 1934, the city clerk wrote a letter to the construction company stating that "the council wishes you to repair a defective slab of cement on the earthen dam which is part of the spillway which needs attention before the reservoir is filled with water." This letter was answered on the 21st of September, 1934, in which the company stated, "We will send a man down to look at this as quickly as we can get a man available." No one came.

Sometime during the months of October, November, or December of 1934, the city made some repairs on the spillway at the cost of $145.06 but as the water rose higher the repairs proved ineffectual and on January 16, 1935, the city attorney, Mr. Slaymaker, notified both the construction company and the bond company to the effect that the workmanship and material used in the construction of the spillway and other parts of the dam were defective and that it would be necessary, at once, to spend a large sum of money for material and labor to repair, renew, and rebuild (the) same to keep the dam from washing out and attention was called to the $145.06 already expended and demanding payment thereof and notifying them of the necessity of making the additional repairs at once and that the city was going to proceed to do said work and hold them liable for all of the expenses incurred and would bring suit on the bond to recover the same. The bond company replied but the construction company did not answer this letter. Thereafter, the city made the repairs and in February 1935, brought this suit to recover its damages in the alleged sum of $10,000. Jury was waived and trial had to the court resulting in a judgment for $2,500 plus interest and costs. Hence, this appeal.

The principal defense was that the city had accepted the work, settled for it and took it over, and this fact of acceptance was set out in the petition and admitted in the answer and

nothing appeared in any of the pleadings which overcame the effect of this acceptance. This question was raised in the answer and also by motion in arrest of judgment. There are no allegations of fraud in any form, and, it is only fair to say that no actual fraud was even hinted at in the evidence. Whether or not the facts would warrant a finding of legal or constructive fraud we do not need to determine. We are satisfied the pleadings do not raise the issue of fraud. The action is for damages for breach of the contract and conditions of the bond. At any rate, the trial court so interpreted the issues and tried and decided the case on this theory. The pleadings and some of the evidence and argument of counsel for appellee would indicate that the appellee considered the action one to recover the costs of maintenance under what is considered a one year guarantee. The trial court's view, we think, was correct and the case will be so treated by us.

At the outset we wish to call attention to the fact that this is not a contract wherein the engineer's decision is made final in all things. There is no provision in the contract for an inspector during the progress of the work and the work was not done under an inspector other than inspection at irregular intermittent intervals by the engineer, who drew the plans and specifications, and assisted in laying out the work and selected the pits from which clay was to be taken. The specifications do provide: "any necessary interpretation of the meaning and intent of the plans and specifications shall be made by the Engineer and such interpretation shall be conclusive and final and shall be binding upon the contractor. The Engineer, or his assistant, or representative * * * will inspect the work in progress and the contractor, his superintendent, or foreman shall at all times cooperate in such inspections and furnish complete facilities for the same. Any requests or orders of the Engineer, * * * consistent with the plans and specifications, and apparently necessary for the proper and expeditious execution of the work shall be carried out by the contractor. * * * Imperfect or condemned materials shall be removed from the location of the work without unnecessary delay and any defective work shall be remedied or replaced on the order of the engineer." Final payment was deferred until "30 days after the work is fully complete, inspected and proven to be fully satisfactory and accepted

by the City of Osceola'' in accordance with sections 10310 to 10312, chapter 452, Code of Iowa.

The clay pits from which materials were to be taken for the construction of the dam were to be selected by the engineer. The engineer was, also, given the right to determine the amount of water and the amount of tamping to be done in order to obtain an impervious and water-tight construction. The amount of wetting the contractor should employ was also left to the engineer. If, in the opinion of the engineer, the scrapers and horses, or tractors did not sufficiently pack the materials, the contractor would be required to employ the use of a heavy road roller. Following all these is this specification:

''The Dam shall be water-tight when finished and the contractor shall assume entire responsibility for obtaining of a water-tight structure.''

The basis for the legal doctrine, that acceptance of the work bars recovery on the construction bond, is that it would be unjust and inequitable, where the city has an engineer who is, in fact, an agent of the city, whose duty it is to inspect the work as it progresses and to pass on the quality of materials to be used and to determine the amount of water to be supplied and the way and method of the rolling and packing of the materials, to permit the city to wait until the work was finished and then complain of violations of the specifications and which might require the contractor to rebuild the entire dam when, had the engineer spoken at the proper time as the work progressed, the matters complained of could have been easily remedied. See Koch Sand & Gravel Co. v. Koss Const. Co., 221 Iowa 685, 266 N. W. 507.

Under such circumstances the principle of law is, as laid down by courts throughout the country, that in the absence of fraud or mistake acceptance of the work bars and estops the city *for defects known or discoverable* by reasonable attention on the part of the engineer in the performance of his duty in inspecting the work. [Italics ours.] However, the basis of the doctrine of estoppel and waiver does not exist where the thing complained of was undiscoverable and unknown at the time of acceptance. It is a well known and recognized principle of law that there can be no waiver of a condition unknown. This principle was plainly recognized by the legislature of this state

when it provided as one of the conditions to be contained in every contractor's bond "that no provision of this bond or of any other contract shall be valid which limits to less than one year from the time of the acceptance of the work the right to sue on this bond for defects in workmanship or material not discovered or known to the obligee at the time such work was accepted."

This condition in the bond creates no new or additional obligation but only provides against the parties placing anything in the contract that would bar right of recovery (not on some other bond) on this bond for undiscovered and unknown defects (undiscovered when?) at the time of acceptance. The court has laid down the rule that acceptance of the work in the absence of fraud or mistake is a complete bar to recovery on the construction bond and that such fraud or mistake to overcome the acceptance must be alleged and proved. Sioux City v. Western Asphalt Paving Corporation, 223 Iowa 279, 271 N. W. 624, 109 A. L. R. 608; Ottumwa v. McCarty Improvement Company, 175 Iowa 233, 150 N. W. 586, 154 N. W. 306, Ann. Cas. 1917E, 1077.

We further state in the Sioux City case [page 291 of 223 Iowa, page 633 of 271 N. W.] that this fraud "may consist of fraud inducing the acceptance, or it might inhere in the acceptance where the officers of the city colluded with the contractor, or it may consist of what is termed 'legal fraud' due to acceptance of work which does not comply substantially with the specifications, and which the council would have no legal authority to accept." We have in the specifications, in the instant case, the provision: "the dam shall be water-tight when finished and the contractor shall assume full responsibility for the obtaining of a water-tight structure." This specification cannot be ignored and should be given such meaning, force, and effect as was contemplated by the contracting parties. We find nothing in the specifications which limits, modifies, or supersedes this sweeping provision. The dam was built to hold water permanently. Its purpose was to provide a reservoir from which at least a portion of the city's water supply could be obtained. The contractor according to the plain language of the contract assumed "entire" responsibility for obtaining a dam that was water-tight when finished; that was a part of his absolute duty. If he failed in this, his duty was not fully performed, which in turn would

amount to a breach of contract rendering the contractor and his bondsman liable and they should respond in damages. Anything less than this fails to mete out even-handed justice. Neither the engineer nor the city officials were to assume or did assume to pass on the water-tightness and did not at any time undertake to say: ''This dam is now water-tight.''

There was, however, a resolution regularly adopted by the city council accepting the work when completed, in these words, ''that the improvements so constructed by the contractors above named be accepted and approved by the council.'' Under such circumstances is the city barred and estopped from recovering when it was not possible at the time of acceptance to determine with any degree of certainty, without the presence of water behind the dam, whether it was a water-tight construction? To so hold would seem harsh and unreasonable, when applied to a matter of this kind entirely unknown by either the contractor or the city and undiscoverable without the presence of water. If a defect is unknown at the time of acceptance due to fraudulent concealment, the acceptance would not be a bar. Concealment here is due to the very nature of the structure. The general rule is announced in 19 R. C. L., paragraph 361, p. 1076:

''It is usually provided in contracts for the construction of public works entered into by municipal corporations that the work shall be done under the supervision of the city engineer and that no payment shall be made except upon his certificate that the work has been properly performed, and it is well settled that the approval of the work by the city engineer under whose supervision a contract for public improvement is to be performed will, in the absence of fraud or concealment which prevents a discovery of imperfections, estop the municipality from contesting the contractor's right to the contract price because of failure to perform the work according to the specifications, *so far as defects are concerned which were discoverable by reasonable attention to the duties of inspection.* * * * '' [Italics ours.]

See, also, the recent case of Wauwatosa v. Jacobus & Winding Constr. Co., 223 Wis. 401, 271 N. W. 21, 110 A. L. R. 131. Here again we see the rule applied only: '' * * * so far as defects are concerned, which were discoverable by reasonable attention to the duties of inspection.'' If acceptance of the work is a complete defense even against defects ''not discovered or

known'' at the time of acceptance, then what purpose would be accomplished by the legislature in requiring that every bond shall contain the provision:

"That no provision of this bond or of any other contract shall be valid which limits to less than one year *from the time of the acceptance* of the work the *right to sue on this bond* for defects in workmanship or material not discovered or known to the obligee *at the time such work was accepted.*"? [Italics ours.] Section 10304.

■ We are of the opinion that the fair and reasonable intent and meaning of the contract, as well as of the statutory provisions of the bond, to be that, in so far as undiscovered and unknown defects are concerned, the acceptance of the work should not operate as a bar to recovery for damages on account of such defects. While not plainly expressed, this must be held to be an implied condition of the bond. Section 10303, Code of Iowa.

As to this question of water-tight construction, appellants urge three points: (1) That there is no sufficient evidence that the dam was not water-tight when finished; (2) that there is no competent or sufficient evidence that the claimed condition of the dam in the fall of 1934 and the following winter was due to any violation of the specifications by the contractor; and (3) that the specification placing the entire responsibility of obtaining a water-tight structure upon the contractor is a general specification and not controlling if the dam was in fact constructed in accordance with the detailed specifications as interpreted and approved by the engineer. Of these in their order:

■ (1) No one testified that the dam was not water-tight when finished. Perhaps, a competent engineer might be able to give an opinion as to this matter, but neither side offered any direct testimony as to this. Some of the lay witnesses testified that it would be impossible to determine this question until water was present behind the dam. The major portion of the trouble occurred at the spillway at the west end of the dam and the water never reached an elevation sufficient to run over or through the spillway until more than six months after the dam was completed and accepted. As soon as the water reached the spillway it began to percolate through the joints between the slabs of concrete covering the spillway. The evidence shows that

the dirt had receded or settled away from the concrete from a foot to eighteen inches in some places; that some of the slabs had settled down, making an opening through which the water poured, and that, in order to save the dam from going out, the city was compelled to put in, first, temporary work and a short time later a permanent 12 inch concrete wall, 5 feet deep, clear across the spillway and, also, to reconstruct several of the slabs, and, finally, reconstructed the entire north side of the cement work covering the spillway. The evidence is undisputed that all this work was necessary to keep the water from coming through under the spillway and to preserve the dam. We are of the opinion that it was a question for the court to determine from fair and reasonable inferences, to be drawn from the facts and circumstances, as to whether or not the dam was, in fact, a water-tight structure when finished.

■ The second point is that there is no causal connection between the alleged violation of the specifications and the damages; that the condition of the spillway in the fall of 1934 could be attributable to natural causes due to freezing followed by the extreme heat and drought of the following summer. Appellants' evidence was to the effect that earthen dams are expected to settle some and that the condition found in the fall of 1934 could have been the result of natural settlement and the extreme weather conditions. This is not disputed by any direct testimony. It was for the court to weigh the evidence of these witnesses and consider it along with all the other facts and circumstances and determine whether to accept this explanation as a fair and reasonable justification for the dirt settling away from these slabs from 12 to 18 inches and leaving this large space below the cement over the spillway. The third proposition is that since, as appellants contend, the engineer had the privilege of interpreting the specifications and made no objections to the methods used and finally approved the work, this nullified the general specification placing entire responsibility for a water-tight structure upon the contractor. That, in fact, the dam was built in accordance with the plans and specifications and, if it failed to hold water, the fault was on the engineer. Appellants do not claim there was anything wrong with the specifications.

Devin, the man who superintended the construction of the dam for the construction company, admitted on the witness stand that there was nothing wrong with the plans and specifica-

tions and that, if the dam was built according to the plans and specifications, there shouldn't or wouldn't be any trouble with the dam when it was completed.

Appellants contend the evidence shows the plans and specifications were, in fact, complied with and, if there was any variance, there was no evidence of causal connection between such variance and claimed damage. There is the above admission from appellants' own foreman and at least one defendant's witness testified that if the dirt had been put in as the specifications called for that the settlement would not have been enough to have been detrimental to the dam. There was one flagrant variation from the plans and specifications which is plainly evident and that is in the construction of the core wall through the center of the dam.

A cross section through the dam is shown on the plans and it shows a 12-foot core wall extending through this dam from top to bottom and extending down below the natural surface of the ground to solid clay and on this blue print of the plans across the core wall space is printed these words: "Clay puddle core wall." Webster's New International defines the words "puddle", "puddle wall", and "puddling". "Puddle, Clay, or a mixture of clay and sand, kneaded or worked, when wet, to render it impervious to water." "Puddle Wall, *Civ. Engin.* A puddled-clay core wall of a dam." "Puddling, *Hydraul. Engin.* The process of working clay, loam, pulverized ore, etc., with water to render it compact, or impervious to liquids; * * *" The specifications call for this core wall to be constructed of select clay and put in in 12-inch layers wetted and tamped. This was not complied with above the ground level. Appellants offer the excuse that the amount of wetting and tamping was left to the engineer and he saw what they were doing and never ordered anything different. We are quite sure the contractor may not nullify the responsibility placed upon him of securing a watertight structure by offering a structure which does not substantially comply with the detailed plans. In fact, he was bound to know that even the engineer was not permitted to substitute a common dirt fill for a 12-foot core wall of clay puddle mud construction. The core wall above the ground level was put in just as the rest of the dam. True, the specifications provided the core wall could be "carried up along with the rest of the dam"; that is, it did not have to be carried up and completed

separately, but this cannot mean the core wall was not to be puddle clay construction. True, the engineer was there enough of the time to see the way the work was being done, and, so far as this record shows, made no complaint because of the fact that the core wall was not of puddle mud construction. But it surely does not require an expert to know that a puddle mud construction of a 12-foot core wall supported on either side by clay filled in in layers of 6 inches and properly compacted would be more impervious to water after it settled and hardened than a common fill put in as this dam construction was with all loose dirt sprinkled a little and run over with the rollers and trucks. Furthermore, when it came to filling the spillway (and it was at the spillway that this trouble occurred) there was no core wall construction above the ground. The concrete walls at either side of this spillway started from the ground and extended up within about 5 feet of the top of the dam. The walls were 60 feet apart and the dirt was placed in between these walls by backing the trucks in at the south end and dumping the dirt and rolling it with a roller, the vehicular traffic of the equipment never passed back and forth over this in any other way. It isn't strange that the settlement was considerable in the spillway portion of the dam, constructed in this way. True, there were no detailed specifications directly applicable to the filling of dirt in the spillway, but this placed the burden of making it watertight all the more forceful on the contractor, for in the absence of detailed specifications, the general specification would control. The city contracted for a water-tight dam; the contractor bid on such a structure; it paid for such a dam; such a dam was not constructed. The city notified the contractor as soon as this was discovered and gave him an opportunity to make it good. When he failed to do so, the city did the work itself. The work in making the repairs and reconstruction was much more expensive than it would have been, no doubt, had the work been properly done in the first place, but, who is to blame for this? Perhaps all parties have a part in the blame, but only one was held responsible for a water-tight structure and that was the contractor. What the contractor's liability would have been had he complied fully with the plans and specifications in the detailed construction of the dam, and yet the dam failed to hold water, we are not called upon to determine.

The pleadings on behalf of the city are far from satis-

factory. The original petition was a mass of conclusions and the contractor was compelled to attack the same by motion to strike and for more specific statement and to appeal to this court from an adverse ruling on the motion for more specific statement (see City of Osceola v. Gjellefald Constr. Co., 220 Iowa 685, 263 N. W. 1) in order to get the issues properly made up. After this there was an amendment filed in an attempt to meet the requirements of the opinion in the above case. Much of the evidence went in over objections to its competency under the issues, which evidence was received on the statement of counsel for the city to the effect that he would introduce the evidence and later file amendments to meet the proof. Two or three such amendments were permitted to be filed. This was done despite constant objections by appellants' counsel. To say the least, this is poor practice, especially in a law case. Much of the evidence was introduced over omnibus objections which by agreement of the parties were to apply to all the questions calling for similar testimony. Many of the objections and rulings came after the questions were answered which were not followed by motions to strike. All of which is subject to condemnation in the trial of a law case. Such a record should not be permitted and, if this court has failed in its effort to give proper consideration to objections and rulings touching the admissibility of evidence, the blame for such consequence will have to fall where it may. However, as we read the record, we are constrained to hold that there is sufficient conflict in the evidence and enough competent evidence to support the judgment of the trial court with one exception.

In reconstructing the concrete on the north side of the spillway it was put in solid, 6 inches thick with steel rods or bars used for re-enforcing. Such a construction was not called for by the specifications and the evidence shows without dispute that the additional thickness and the use of steel bars for re-enforcing cost about $938 more than it would have cost to replace it with material called for by the specifications. The contractor should not be required to pay for this superior quality and quantity of construction. Fitts & Co. v. Reinhart, 102 Iowa 311, 71 N. W. 227; Baylies v. Bent, 185 Ill. App. 437; Roberts v. Sinnott, 55 Mont. 369, 177 Pac. 252; 1 Hudson, Building Contracts, 1914 Ed., 485-487. The judgment should be reduced by the sum of $938.

We are also of the opinion that the statement in the judgment to the effect that the judgment is not a bar or adjudication to any claim of plaintiff for damages against the defendants for additional future damages should be eliminated. Recovery may not be had on this bond by piecemeal.

As thus reduced and modified, the judgment will stand affirmed.—Modified and affirmed.

STIGER, C. J., and ANDERSON, RICHARDS, and KINTZINGER, JJ., concur.