NORDIN CONSTRUCTION COMPANY,
Inc., et al., Appellants,

v.

CITY OF NOME, Appellee (two cases).

CITY OF NOME, Appellant, v. NORDIN
CONSTRUCTION COMPANY, Inc.,
et al., Appellees.

Nos. 1290, 1299 and 1520.

Supreme Court of Alaska.

Oct. 1, 1971.

Rehearing Denied Oct. 29, 1971.

C. R. Kennelly, Nome, and Millard F. Ingraham of Ingraham & Niewohner, Fairbanks, for City of Nome.

Richard Folta and Howard Staley of Merdes, Schaible, Staley & Delisio, Fairbanks, and Stuart G. Oles, and H. H. Halstead, of Degarmo, Leedy, Oles and Morrison, Seattle, Washington, for Nordin Construction Co., Inc., United States Fidelity & Guaranty Co., and Bronson, and others.

Before BONEY, C. J., and DIMOND, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

This case revolves around the award and ultimate payment by the City of Nome [hereinafter, "City"] of a construction contract for a water and sewer system in Nome to Nordin Construction Co., Inc. & Associates of Fairbanks [hereinafter, "Nordin"]. The finding by a jury required Nordin to return the money paid by the City for failure of Nordin to substantially perform the contract.

The firm of Philleo Engineering & Architectural Services of Fairbanks [hereinafter, "Philleo Engineering"] prepared the plans and specifications for the system consisting of the following basic elements:

| | | |
|---|---|---|
| A. | General provisions and mobilization, bond, move-in, etc. | $ 62,800.00 |
| B. | Utilidors and manholes | 748,733.00 |
| C. | 10" direct burial water pipe | 51,462.00 |
| D. | Raw water intake and pipeline | 38,100.00 |
| E. | Water storage tank and pump room | 165,805.00 |
| F. | Sewage treatment plant, building and lift station | 125,550.00 |
| G. | Miscellaneous work in sewage | 24,250.00 |
| H. | Utiliducts | 137,185.60 |
| | | $1,353,885.60 |

The project was bonded by United States Fidelity and Guaranty Company.

Construction took place during the years 1964 and 1965, with periodic payments made as the work progressed. When the "Final Pay Estimate" was submitted for the period of September 30 to December 4, 1965, Nordin claimed that the work was substantially completed. The City's resident engineer, Mr. Gerald Freese, testified

that he had approved the final estimates and Mr. Philleo of Philleo Engineering, which supervised the construction, testified that he had determined the work was acceptable, and that he had so notified the City.

On December 4, 1965, the City Council voted to pay Nordin the remainder of the contract price, reserving $20,000 for the correction of certain deficiencies.

In February of 1966, the City engaged the Seattle engineering firm of R. W. Beck & Associates to further inspect the sewer and water system. Mr. George Martin made the inspection, spending approximately three days going through the utilities system, compiling a punch list of the work which seemed to be deficient. On February 8, 1966, the City Manager wrote a letter to Nordin enclosing the punch list and indicating what corrections were necessary. Thereafter, the City issued Nordin a check in the amount of $20,000. Nordin returned this check[1] and the City issued another in the amount of $17,500, retaining $2,500 as the monies due under the contract to insure completion of the remaining corrections from the Martin punch list. Mr. Jeffress of Globe Plumbing & Heating, a Nordin subcontractor, asserted that the deficiencies were corrected with five minor exceptions. However, correction was denied at trial by the plumbing foreman on the job for Globe.

On April 23, 1966, Nordin submitted a claim to the City for additional compensation of $196,334.59, for extra work required by changed conditions. In response, the City filed the present action against Nordin, its surety, and several associates, for $3,786,542.16, alleging a failure of substantial performance by Nordin and resulting consequential damages. Nordin denied any breach and counterclaimed for the amount set forth in the claim for additional work.

There were several motions for summary judgment and for change of venue which were denied. On September 5, 1969, a pre-trial conference was held which re-

---

1. Nordin declined to accept the check because of the "Acceptance of Final Payment as Release" contract clause.

sulted in a stipulation that trial be held in Anchorage, and in an order that the parties file amended pleadings.

The amended complaint was filed on September 15, 1969, and alleged that the work did not substantially comply with the terms of the contract. The complaint further stated that as a result of the substantial nonperformance, Nordin was entitled to no compensation for the work performed, and should repay the $1,391,542.16 which had been paid.[2]

In answer to the amended complaint, Nordin specifically denied the allegations of substantial breach, and counterclaimed for the sum of $198,854.59 for extra work required by changed conditions. The only affirmative defense alleged by Nordin was acceptance by the City.

In its final pleading the City denied the allegations of the counterclaim, and replied to the affirmative defense by stating that no acceptance had occurred, or, in the alternative, that acceptance if found: (1) did not go to faulty materials because of the terms of the contract, (2) could not vitiate latent defects, or (3) would be nullified as induced by fraud, actual or constructive, of Nordin or the architect/engineer, Philleo Engineering.

The case was submitted to the jury which found that Nordin failed to substantially perform and that the total amount paid

under the contract should be returned to the City. The jury further found that Nordin should be awarded its counterclaim for extra work performed. Judgment was entered on this verdict. Both parties have appealed. An appeal by Nordin from a denial of a Civil Rule 60(b) relief from judgment motion has also been consolidated.

I

 The central issue in this case, both at trial and on appeal, has been whether Nordin substantially performed the contract. Before considering whether a jury question was presented on that issue by the evidence below, however, it is necessary to examine the City's theory of recovery.

The City did not proceed on a theory of damages for defective performance.[3] Rather, the City sought restitution of money paid, based on an alleged failure of substantial performance by Nordin. In so doing, the City relied upon the principle, well settled in American construction contract law, that " * * * 'substantial performance' is the condition—the fact that must exist before payment is due." [4] The distinction between theories of recovery was simply stated in Little Thompson Water Ass'n v. Strawn, 466 P.2d 915, 917 (Colo.1970), as follows:

> The rules appear to be that if the promisor proves complete and full perform-

2. The City apparently forgot that $2,500 had been retained from final payment.

3. For a case setting out principles of recovery of damages for breach of a construction contract, see Hopkins Constr. Co. v. Reliance Ins. Co., 475 P.2d 223 (Alaska 1970). Under the harsh common law rule, no recovery could be had on building contracts by a contractor whose performance was less than full and complete. Although not without conflict, courts have gradually moved to the position of allowing contractual recovery by a contractor in cases of substantial performance. The "owner" must rely for relief on the remedy of contract damages measured either by the cost of correcting deficiencies or, if economic waste would result, by the decrease in value of the structure due to the defective performance. Annot., 76 A.L.R.2d 805 (1961).

In this case, however, the City, by its pleadings, sought primarily to show nei-

ther cost of correction nor decreased value. Rather, the City's burden was to prove that the integrated system, as a whole, was so defective, and that it constituted such a failure of contractual performance, as to entitle Nordin to no recovery under the contract. For the possibility of non-contractual recovery where there has been a failure of substantial performance, see Part II, *infra*.

4. 3A Corbin on Contracts § 701 at 314 (1960). *See also* Guittard, Building Contracts: Damages and Restitution, 32 Tex.Bar J. 91, 121–22 (1969) ; 4 McBride & Wachtel, Government Contracts § 31.10 [5] (1969) ; Note, Substantial Performance of Building Contracts in New York, 31 Colum.L.Rev. 307, 309 (1931) ; 17 Am.Jur.2d, Contracts § 375 ; City of Chariton v. J. C. Blunk Constr. Co., 253 Iowa 805, 112 N.W.2d 829 (1962) ; Sioux City v. Western Asphalt Paving Corp., 223 Iowa 279, 271 N.W. 624 (1937).

ance, he is entitled to recover the complete and full consideration bargained for; if the proof establishes something less than full and complete performance, that is, substantial performance only, he is entitled to recover the contract price less those necessary expenditures required to complete the performance bargained for; and if the performance falls short of being substantial, then the promisor is entitled to no recovery.

In order to recover, therefore, it was incumbent upon the City to prove a failure by Nordin to substantially comply with the terms of the construction contract.

As with many general legal principles, it is impossible to lay down precise rules of mathematical application to govern the issue of what amounts to a failure of substantial performance. Professor Corbin summarizes the problem as follows:[5]

It is not easy to lay down rules for determining what amounts to 'substantial performance,' sufficient to justify a judgment for the contract price (subject to a counterclaim for injury, if asserted) in any particular case. It is always a question of fact, a matter of degree, a question that must be determined relatively to all the other complex factors that exist in every instance. The variation in these factors is such that generalization is difficult and the use of cases as precedents is dangerous. (footnote omitted)

Such factors as the extent of performance and the wilfullness of the breach have obvious relevance.

Nordin has argued throughout this case that there is no evidence upon which a failure of substantial performance could be maintained, and specifically states as follows:

Thus, we have testimony only of the need to rebuild only 12% of 20% of the

utilidor system, or *2.4% of the utilidor system*. This amounts to less than 1½% of the entire sewer and water system that was built by Nordin. Yet, this is the record on which the jury has found against the defendants for $1,391,542.16, whereas 2.4% of the value of the entire utilidor system ($748,733.00) would equal only $17,969.59.

Nordin argues that there was no testimony concerning the ten-inch direct burial waterpipe, the raw water intake and pipeline, the sewage treatment plant building, lift station and utiliducts, and only *de minimis* testimony as to the water storage tanks and pumprooms.

Previously this court has held that a jury issue is presented unless the court can say that reasonable minds cannot differ on the issue to be presented.[6] In order to uphold the view of Nordin, we must be able to say that there was no evidence upon which a failure of substantial performance could be inferred by reasonable jurors when the evidence is viewed in the light most favorable to the City. We, therefore, must review the evidence presented at the trial to apply the rule in this case.

### A. UTILIDOR AND UTILIDUCTS

A basic element in the construction of the utilidor to contain the sewer and water pipe was the use of proper materials for bedding and backfill. Six inches of select class 1 gravel was required to be placed under the utilidor; unclassified material selected from the trench excavation, free from organic material, was required to be placed along the sides of the utilidor; one foot and a half of select class 2 gravel was required to be placed immediately on top of the utilidor; and six inches of select class 1 gravel was required to be placed on the surface of the backfill. Class 1

---

5. 3A Corbin on Contracts § 704 at 318–19 (1960). *See also*, Restatement of Contracts § 275, comment (a) (1932).

6. *See* West v. Adm'rx of the Estate of Nershak, 440 P.2d 119 (Alaska 1968); Bolden v. City of Kodiak, 439 P.2d 796 (Alaska 1968); Merrill v. Faltin, 430 P.2d 913 (Alaska 1967); Bertram v. Harris, 423 P.2d 909 (Alaska 1967); City of Fairbanks v. Nesbett, 432 P.2d 607 (Alaska 1967); Mallonee v. Finch, 413 P.2d 159 (Alaska 1966); Saslow v. Rexford, 395 P.2d 36 (Alaska 1964), rev'd Rexford v. Saslow, 425 P.2d 611 (Alaska 1967).

and class 2 are both clean beach gravel, differing only in the sieve analysis size of the gravel. The contract also required the backfill to be compacted at one-foot intervals, to 90% compaction up to two feet below finished grade and 95% compaction above.

Mr. Edward Devine, a carpenter for Nordin, testified that the same material that was excavated from the trench was placed back as fill. He further testified that in some places the utilidor was laid directly on permafrost, without the required bedding under it, and in other places was laid in water.

Mr. Robert Scott, Nome City Clerk, testified that mud, planks and logs were used as backfill. Mr. Dallas Eberle, Nome Utility Manager, testified that the material excavated from the trench contained old wood and planking and that this material was replaced as backfill. Mr. Donald Reader, Nome councilman, testified that the material excavated consisted of mud and silt with organic material such as driftwood and planks, and that this same material went back into the trench as backfill. Reader further testified that the material was just shoved back in and was not compacted. In some places, the excavated material was used as bedding; in others, the utilidor was placed directly on water or permafrost with no bedding.

Mr. Robert Morse, a former employee of Nordin, testified that the material excavated consisted of planking, board, tundra, silt, permafrost and glare ice. This same material was used as backfill. In many places there was no bedding used and the utilidor was built right on water, permafrost and on mud. There was no compaction.

Mr. Charles Reader, Nome contractor, testified that the soil excavated from the streets of Nome consists of tundra and decomposed vegetation, and is full of planks, old firelines and old drains, the remains of the old town. No beach gravel went into the bedding. The utilidor was laid right on the ground as it was in the ditch. The backfill was just shoved in with a dozer without compaction.

Mr. James Smith, a professional engineer and manager of Engineering Science of Alaska, testified that when he examined an exposed portion of the system after it had been built he observed a void under the utilidor, where the bedding was supposed to have been, and the backfill was full of timber and tundra. The first two or three feet of material from the ditch consisted of "* * * 50 percent old board and junk and accumulation of 70 years of civilized living." Mr. Smith further testified that the material existing in the streets of Nome, as shown in the drill logs, would not qualify as acceptable backfill under the contract specifications because of the high percentage of organic material present.

From this testimony the jury could have found that six inches of class 1 gravel was not used as bedding, that material free of organic material was not used as backfill, that class 2 and class 1 gravels were not placed on top of the utilidor and that what was used as backfill was not compacted to 90% compaction at one-foot intervals. The jury could have found that the utilidor was placed on mud, permafrost and water with no bedding, that material from the street, full of tundra, planks, timber and other organic material, was used as backfill and that the backfill was pushed back into the trench with no compaction.

There is also testimony concerning the present status of the utilidor. Mr. Allen Doyle, Nome airport manager, testified that he viewed the system in 1966 and 1967 and at that time the sections were pulling apart, heaving, sagging. Mr. Smith inspected five sections of the system in the summer of 1968. In four of these five there was extensive damage to the utilidor. The floor of the utilidor had settled and there was misalignment. One area had so caved in that it was not safe to enter. One section had so flattened out that it did not have the adequate grade to carry sewage. Another section had sharp dips that were developing.

Mr. Eberle examined the utilidor in May of 1969 and observed considerable gaps in it. There were several places where the walls had moved in appreciably. In many places the bottom had dropped out of the utilidor; it had pulled away from the stringers, and the drift pins were no longer preventing the pressure from the ground from moving the walls inward.

Mr. William Buloard and Mr. Vernon Carlson, Nome plumbing contractors, inspected the system before trial at the request of the City. Mr. Buloard testified to the present condition as follows:

> Probably 50 percent of the utilidor now is slumped in at one point or another. The walls—the walls are caving in, the bottom of the floor is separated and there's silt and mud is coming up. In many places the sewer lines have leaked so badly that they've built ice humics up underneath like stalagmites. This ice humic has forced the sewer line up into the air and has broken the joints apart in many instances. There's multiple leaks on the water saddles. Almost every coupling that was used going into the property lines off of the mains leak now. Two of the fire hydrants have never been connected. The rotton wood has slumped in in quite a few of the places. There are places in the utilidor that you cannot crawl through now. There's absolutely no way to get through it. There is over a foot of water in the majority of the overall utilidor along with effluent from the leaky sewer lines that exists now. These are the conditions that I saw.

Mr. Carlson testified that the shifting and sagging of the utilidor and the laterals (or utiliducts) had so misaligned them that connections could not be made to the homes they were intended to serve without tearing up the street. The shifting had caused the sewer system to become plugged. At several places the system was impassable because the walls of the utilidor had caved in.

Mr. Smith testified that if improper backfill was used in the installation, not only would it cause the problems which he and others observed in the system, but that the condition of the system would continue to deteriorate in the future.

When Mr. Smith observed the system in 1968, ten to twelve percent of the portion he was able to inspect needed to be removed and rebuilt. Other portions were in the process of failing. The jury could infer that the entire system was in a similar condition. When Mr. Buloard examined the system prior to trial, about fifty percent apparently needed rebuilding. If part of a system is inoperative, everything upgrade from that part is inoperative. Mr. Smith was of the opinion that the entire system would be relatively inoperative within ten years from the date of initial construction without substantial rebuilding. The cost of rebuilding would be the same as or more than the cost of initial installation.

From this testimony the jury could infer that the whole system will have to be rebuilt within ten years from the date of the initial construction, or it would be inoperative. The jury could infer that the cause of these problems was the failure of Nordin to provide bedding, backfill and compaction required by the contract, especially in view of the expert testimony by Mr. Smith that the design could succeed if the system had been constructed according to specifications. The cost of replacement would be as much as or more than the cost of initial construction. Thus, the jury could find that due to Nordin's breach the City, within ten years from initial construction, would have to spend as much or more to rebuild the system as it has spent in building it.

## B. SEWER AND WATER MAINS

There is testimony of other problems with the entire system. Mr. Buloard worked as a plumber and foreman on the plumbing aspects of the contract. He testified that in some instances the work was not done in accordance with the specifications and that 20% of the entire job was not completed at all.

Tar was burnt off from the inside and outside of the pipes. This causes rust in

the pipes. Improper fittings and couplings were used. This caused leaks in the pipes which now exist. The wooden sewer mains were milled excessively and not creosoted. This caused loose joints, allowing raw sewage to run out. Now the whole system leaks. The water pipes were improperly soldered, creating leaks. Return bins or fittings were not installed, causing the City to repurchase these items at a later time when hook-ups were made. Anchors were not installed, causing the pipe, on expansion and contraction from temperature changes, to "travel" off the hangars, bend, and potentially break. Saddles were improperly installed or not installed at all. A large majority of the water lines that were to be connected to the saddles were not connected, making it now nearly impossible to hook them up. The pitorifices, designed to permit constant water circulation to prevent freezing, were improperly placed; as placed, the pitorifices are "absolutely useless." Thus, every home in Nome is required to have a circulating water pump.

The hangars, from which the sewer pipes hang from the ceiling of the utilidor, lack enough thread for adjustment in some places and in others are not cut deeply enough, causing them to strip when adjustment is made. In at least two places the hangars have pulled through the ceiling because of dry rot in the wood of the utilidor. This failure of the hangars has made it impossible to adjust the grade of the pipe.

The flex hoses that connect the sewer main to the individual sewers were too small and do not fit. Furthermore, these hoses were cut too short. These defects do not permit the hoses to absorb the shifts in the utilidor and cause the hoses to come off. This in turn causes sewer fluids to run into the utilidor rather than into the sewer main.

## C. WATER AND SEWAGE TREATMENT PLANTS

There was a broken pipe for water intake in the Snake River and there was no way to prime the pumps to fill the water storage tank by normal means. The water in the tank had to be backwashed down the line in order to get the water to start flowing in the line and to prime the pumps. When there wasn't sufficient water in the tank, water had to be hauled and poured into the tank to fill it and accumulate the amount needed by those hooked up to the system. This was only corrected subsequently when the City changed the water source to Moonlight Springs by another construction contract not pertinent herein.

Black fittings were placed in the water treatment facilities rather than galvanized ones that would not rust. The black fittings rusted, contaminating the water in the water treatment plant.

Mr. Buloard testified and Mr. Reader confirmed that a crack exists in the foundation of the water treatment plant, which has never been fixed, causing the water to leak out so that every third or fourth day the storage tank goes dry if no attempt is made to keep it filled.

Mr. Howard Crinklaw, former Nome city manager, testified that the saline cutoff on the Snake River water intake was broken. At the first high tide, the entire system filled with salt water because the cutoff failed to automatically close the intake.

Mr. Buloard testified that the chlorinator for the raw sewage discharge was never hooked up at the sewage treatment plant and that as a result the City was contaminating the Bering Sea.

Mr. Crinklaw testified that the City storm drains were cut by the contractor and not repaired, as required by the contract.

## D. TESTIMONY BY CONTRACTOR

In response to this testimony, Nordin and United States Fidelity and Guaranty Company presented oral and supporting documentary testimony which was diametrically opposed to much of the testimony given on behalf of the City of Nome. Mr. Freese, the resident engineer for Philleo on the project, testified that the compacting was done, and that he recommended acceptance because he felt the system was essentially complete and usable. He fur-

ther stated that all of the utiliducts were located as Mr. Slagle, the City Manager at the time of the contract, had requested; that the saline detector was operable, and that certain storm drains were not reconnected by direction of Mr. Slagle himself. He further stated that he approved the burning of holes in the pipes for the pitorifices and the elimination of those thaw wires which were called for by the specifications.

Mr. Loren Payne, the Nordin superintendent, testified that he used mine tailings and beach sand as required in amendments to the specifications, and he only backfilled with original material where the inspector specifically permitted. He testified that he did not put logs or wood in the backfill, and that he had two compactors performing on the job. Mr. Payne denied that the water intake pipe was in any way damaged and asserted that it was properly installed and worked during the period of time that they were on the job. Mr. Payne testified that the drift pins were not put in the utilidors as per the plans because they were ordered changed by the City Manager, Slagle, and that no thaw wires were put in because they were directed not to by Philleo Engineering.

Mr. Martin of R. W. Beck & Associates, Seattle, testified that he inspected the utilidors as requested by the City, that he gave a punch list as a result of the inspection, and that this list constituted all of the work he thought would be necessary to bring the system up to the specifications. Mr. Martin testified he did not check the wood used in the utilidors, that he did not see raw sewage, and that the only deficiency was that certain wooden frost covers were missing from the system. He did state that the ground was frozen at the time he made the inspection in February of 1966, and that he inspected the system from the inside.

Mr. Jeffress, who was working for Globe at the time of the contract as an office engineer, and Mr. John Hegdal, who was the engineer for Nordin in bidding the job, testified that the construction had gone forward according to plans, that the Martin punch list corrections were made, and that the deficiencies claimed by witnesses for the City simply had not occurred. Additionally, Mr. Leslie Gunderson, who was general manager for Nordin at Nome in May, 1965, indicated that problems were caused by the utiliducts not being located by the City, and that the extra work was necessary because of delays by the City in locating property lines. He testified that he had sent several letters calling this to the attention of Philleo Engineering and the City, and he identified several exhibits as copies of the letters.

Mr. Philleo of Philleo Engineering indicated that he had recommended to the City that payment be made and the job accepted, because it was his opinion that the contract had been performed according to the plans and specifications. Mr. Philleo further indicated that there were inspectors responsible to him on the job at all times, and that he relied upon them and the assurances given by the contractor that work was progressing satisfactorily.

In rebuttal to the above testimony, the City recalled Mr. Hegdal, Mr. Morris, Mr. Buloard, Mr. Carlson, Mr. Doyle and Mr. Reader, to again specifically deny that there had been compliance with the plans and specifications.

As we have previously noted, the sufficiency of the contractor's performance under a building or construction contract is generally an issue to be determined by the trier of fact.[7] In order to overturn the verdict of the jury in this case, we must say that there is no evidence upon which reasonable minds might differ in finding that the failure of performance on behalf of the plaintiff was substantial.

---

7. *See* Little Thompson Water Ass'n v. Strawn, 466 P.2d 915, 917 (Colo.1970); Power-Matics, Inc. v. Ligotti, 79 N.J. Super. 294, 191 A.2d 483, 488 (App.Div. 1963).

Nordin advances the position that the evidence of failure to substantially perform was inherently unbelievable, and that "it is a hopeless and formidable task to go to the record and argue against the vague testimony of the hometowners and nonengineers" who testified with regard to deficiencies in the system. However, we decline to promulgate a rule which would require expert testimony to be contradicted by expert testimony in order for a jury question to be presented.[8] We must determine whether there is a jury question on examination of all the evidence and the reasonable inferences which can be raised therefrom.

From the testimony below, it clearly appears that reasonable minds could differ on whether Nordin had substantially per-

formed the contract. The trial court correctly submitted the issue to the jury.

## II

 Nordin argues that even if it failed to substantially perform, the City received something of value, and to permit the City to retain the contract price and the performance rendered works an unjust enrichment.[9] Nordin uses the doctrine as a catch-all to advance the proposition that no matter what happened in the lower court and no matter what were the tactical positions of the parties, the court erred in not awarding Nordin the value of the services it rendered.

An initial question arises as to whether, under the Alaska Rules of Civil Procedure,[10] recovery may be had for unjust

8. In criminal cases [Bowker v. State, 373 P.2d 500, 501–502 (Alaska 1962)], and workmen's compensation cases [Beauchamp v. Employers Liability Assurance Corp., 477 P.2d 993, 996 (Alaska 1970)], we have held that the effect of expert testimony must be weighed with lay testimony by the trier of fact.

9. Nordin seeks recovery under quasi-contract without making any attempt to distinguish between contracts implied in law or implied in fact. It is clear that the appropriate remedy here is a contract implied in law and discussion is based on such an approach.

 Although the distinction between an action based on an "implied in fact" contract and one based on an "implied in law" contract (quasi-contract) may be somewhat doctrinaire, the application of the formalized distinction is necessary in order to arrive at the proper measure of damages. An "implied in fact" contract is grounded on the intention of the parties to form a contract; the parties' assent thereto, although inarticulated, is inferred from the surrounding facts and circumstances. It follows that the general contract theory of compensatory damages is applied, with recovery based on an implied promise to pay the fair market value of the services or goods provided. Reasonable expectations are thereby protected.

 An "implied in law" contract, on the other hand, is a fiction of the law. The obligation to make restitution is not based on any agreement between the parties, either objective or subjective; there is no

expectation interest to protect. Rather, recovery is based on the equitable maxim that one person should not be unjustly enriched to the detriment of another. There being no express or implied promise to enforce, restitution is usually limited to the value of the benefit which was acquired.

*See*, 1, Corbin on Contracts, §§ 18–19 at 39–50 (1963); 1, Williston on Contracts §§ 3–3A at 8–13 (3d ed. 1957); Restatement of Restitution § 155(1) (1937).

10. Alaska Civil Rule 8 provides in part:

 (a) A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim or third-party claim, shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled.

 * * * * *

 (c) * * * When a party has mistakenly designated * * * a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

 Alaska Civil Rule 13(a) provides in part:

 A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third

enrichment where only an express contract is pleaded in the complaint or counterclaim.

In the case at bar, the City brought suit to recover all the money paid under the construction contract, on the ground of substantial failure to perform the contract. The contractor, Nordin, answered that it had performed the contract and counterclaimed for extra work. Nothing was said by way of counterclaim about recovery for unjust enrichment for work actually performed if the City prevailed in its complaint.

Other jurisdictions acting under rules similar to ours have permitted recovery for *quantum meruit* without amendment of the pleadings.[11] Moreover, this court has previously taken the position that the pleadings may be amended to conform to the proof even after the trial has occurred and judgment has been entered[12] so long as the evidence presented provides grounds for the recovery or the defense asserted.

It would thus appear that the contractor could recover in this case for work performed under a theory of unjust enrichment[13] on the state of the pleadings, where there was factual evidence supporting the request for relief. Clearly tied to this position is the idea that the contractor who substantially fails to comply with the plans and specifications cannot rely on the contract for recovery, but must be left to provide actual proof of the value to the owner of the performance tendered.

The adoption of this burden of proof may leave some difficult problems in cases where value is difficult to establish; on the other hand, any other result leaves the owner of the structure with the peculiar problem of attempting to prove the value of an unwanted structure. He may justifiably feel that it has no value to him because it is substantially different from what he contracted for. The problem can be presented in another form: As between the owner and the contractor who has failed to substantially perform, who should have the burden of proving the value of the performance?

Reason dictates that the contractor must show the value of the benefit conferred on the owner, and may not rely upon some artificial rule of damages to protect him.[14]

parties of whom the court cannot acquire jurisdiction. * * *

Alaska Civil Rule 54(c) provides in part:

Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.

11. *See* Matarese v. Moore-McCormack Lines, Inc., 158 F.2d 631, 170 A.L.R. 440 (2nd Cir. 1946); Kansas City, St. L. & C. R. Co. v. Alton R. Co., 124 F.2d 780 (7th Cir. 1941); State ex rel. Gary Electric v. Fireman's Fund Indem. Co., 67 N.M. 360, 355 P.2d 291, 84 A.L.R. 2d 1072 (N.M.1960); Annot., 84 A.L.R. 2d 1075 (1962).

12. Gilbert v. Sexton, 401 P.2d 300, 302 (Alaska 1965); Harris v. Deveau, 385 P.2d 283, 285–86 (Alaska 1963); cf., Merrill v. Faltin, 430 P.2d 913, 915 (Alaska 1967).

13. Although there appears to be some conflict in authority, we think that the bet- ter view is that while there can be no recovery *under the contract* where substantial breach has occurred, there can be quasi-contractual recovery for the value of actual benefits received. *See* 12 Williston on Contracts § 1473 at 220–24 (3d ed. 1970); 5A Corbin on Contracts § 1125 at 18 (1964); Restatement of Contracts § 357(3) (1932); McCormick on Damages § 167 at 646 (1935).

14. There are cases which provide for recovery at the contractual rate for less than substantial performance. A close examination of such cases, however, shows in reality substantial performance and an attempt to soften the harshness of the early contract rule requiring no recovery unless there was complete performance. We sympathize with the position taken in such cases, but feel the purposes to be served by such doctrine are better established by requiring the contractor to prove what benefit he has conferred where he fails to substantially perform. If he unilaterally changes his performance in a substantial manner, he cannot expect to be given the benefit of

Any value testified to by the unhappy owner may be understandably less than the actual benefit he receives. On the other hand, the contractor has cost records and can present expert testimony on value which will provide a basis for arriving at a fair value of the benefit or which, at the very least, can provide a starting point from which the owner can present rebuttal testimony.

However, it is clear that, whatever test is used, some evidence of value of the benefit must be presented. Actual use does not necessarily prove that a net benefit has been conferred upon the owner. The value

of the use could be more than offset by the injury.[15] Professor Corbin points out that making the best of a bad situation does not necessarily signify benefit:

The mere fact that the defendant is in possession of the structure erected by the plaintiff on the defendant's land is not in itself sufficient to show that the defendant has accepted it in any sense, or has used it, or is benefited by it. Furthermore, his actually making use of it does not prove that the benefit derived therefrom is in excess of the injury caused by the plaintiff's breach. Use of the structure, however, is some evidence of

contractual provisions as to value which also include profit and overhead figures.

15. *See* Turner v. Henning, 262 F. 637 (D.C. Cir. 1920), where a builder constructed a defective concrete flooring and porch. The owner used these, without tearing them out and reconstructing. This was held not to be "acceptance", and the owner still had a right to damages measured by the cost of reconstructing according to specifications and not merely to the difference in value of the agreed building and the defective building. In 5A Corbin on Contracts § 1126 at 27 (1964), Professor Corbin notes that "[t]here are a good many cases in which it definitely appears that part performance by the plaintiff has actually resulted in no benefit to the defendant. In these the plaintiff cannot get judgment for compensation." *See also* Carpenter v. Josey Oil Co., 26 F.2d 442 (8th Cir. 1928); Poynter v. United States, 41 Ct.Cl. 443 (1906); Mountain Terrace Land Co. v. Brewer & Jones, 165 Ala. 242, 51 So. 559 (1910); Chico Well Drilling Co. v. Givens, 206 Cal. 468, 274 P. 966 (1929); Cooper v. City of Derby, 83 Conn. 40, 75 A. 140 (1910) (architect); Scholz v. Schneck's Estate, 174 Ind. 186, 91 N.E. 730 (1910) (contract to help defendant buy a railroad); Gwinnup v. Shies, 161 Ind. 500, 69 N.E. 158 (1903) (contract to construct a cement walk, result of no value); Keys v. Garben, 149 Iowa 394, 128 N.W. 337 (1910) (contract to repair a building, left worse than before); Biedenharn v. Waters, 169 La. 1006, 126 So. 508 (1930); Lohmuller Bldg. Co. v. Barrett, 146 Md. 617, 127 A. 482 (1925) (contract to repair and remodel a house); Meyer v. Frenkel, 113 Md. 36, 77 A. 369 (1910) (plumbing); Presbyterian Church v. Hoopes, Co., 66

Md. 598, 8 A. 752 (1887) (contract to cover parsonage with certain stone, performance totally defeating the purpose intended because of the use of streaked and unsightly stone); Gillis v. Cobe, 177 Mass. 584, 59 N.E. 455 (1901); Feeney v. Bardsley, 66 N.J.Law 239, 49 A. 443 (Er.App.1901) (the court puts a case where the plaintiff built 1½ instead of 2½-story house); Lundin v. Butternut Valley Tp., 172 Minn. 259, 214 N.W. 888 (1927); Kupfer v. McConville, 48 N.D. 609, 185 N.W. 1005 (1921) (a well digger drilled 1315 feet, instead of 1450 as agreed, and voluntarily abandoned the job, having produced no water; quantum meruit was refused, the plaintiff having offered no proof either of the value of the well as an addition to the land or as to the injury to the defendant caused by the breach); Exeter Mach. Works v. Wonham-Magor Eng'r Works, 134 App. Div. 386, 119 N.Y.S. 105 (1909) (contract to install cable drives); Manning v. School District, 124 Wis. 84, 102 N.W. 356 (1905) (defective heating system); City of Madison v. Am. Sanitary Eng'r Co., 118 Wis. 480, 95 N.W. 1097 (1903) (city allowed its sewage to run through the filter beds constructed by the other party at the outlets, but the whole plant had to be replaced); Williams v. Thrall, 101 Wis. 337, 76 N.W. 599 (1898) (defective furnace); Fuller-Warren Co. v. Shurts, 95 Wis. 606, 70 N.W. 683, 685 (1897) (furnace unusable because of leakage of noxious gas, the defendant "was not bound, in order to avail herself of her right of defense, to take out the furnace, and transport and deliver it to [plaintiff]"); McDonald v. Miller, 73 Wis. 20, 40 N.W. 665, 667 (1888) (expense of completion "would likely exceed the entire contract price.")

benefit. Indeed, the very existence of the structure on the defendant's land is such evidence, though far from conclusive. If the plaintiff successfully proves a substantial net benefit, he should be given judgment for that amount.[16]

In the case at bar the City alleged material nonperformance of the contract and presented evidence that the entire system would be inoperable within ten years of construction without major repairs. The only financial data permitted by the trial court showed that the system lacked about $11.00 per month of breaking even in November of 1967.

All attempts to show that the system was partially funded by revenue bonds and the life of such bonds were excluded by the trial court upon objection of Nordin. Expert testimony as to the normal life of such a system was also excluded by the trial court on objection from Nordin. Similarly, every attempt to prove partial value of any component part of the system by cross-examination of witnesses was objected to by Nordin and sustained by the trial court.

The trial court did permit the introduction into evidence of Cost Estimate Nos. 1, 3 and 14, the final estimates as to costs, and the construction progress chart, which gave a limited view of the progress of the work, and of the dollar value assigned by the contractor and engineer to the various elements which were to make up the completed job. However, there is no evidence showing the benefit that a component part would have to the City, nor is there any testimony which equates cost of construction, including overhead and profit, with benefit to the City.

. Finally, Nordin strenuously objected to the use of a verdict form which would have permitted the jury to return a verdict for the City of less than the full contract price, and as a result the court filled in the blank space with the entire contract price. Nordin utilized an all-or-nothing approach in its final argument to the jury.

As previously noted, recovery either by permitting amendment to the pleadings or even without such amendment will be permitted where the proof establishes that the party seeking the recovery is clearly entitled thereto. However, the remedy of unjust enrichment, while equitable in nature, must necessarily be grounded on the proof presented. Neither the court below nor this court can substitute legal theory for evidence where no evidence is presented.

In this case the trial court clearly recognized the problem and pointed it out to counsel.[17] Under such circumstances we will not intercede to sift the record and attempt arbitrarily to establish values for component parts of the system. We cannot say that on the facts presented the City was unjustly enriched. While Nordin may have been entitled to some compensation for benefits conferred, Nordin submitted no proof as to such benefits and, moreover, kept proof from being submitted by the City. We thus find that the appellant has not established facts upon which a finding of unjust enrichment could be based.[17A]

---

16. 5A Corbin on Contracts § 1126 at 23–24 (1964) (footnotes omitted).

17. "I probably shouldn't say this, but I—have believed right from the very start—as soon as the evidence was before the Court, the jury, that this sewer system just did not come up to the standards acceptable in that industry by any experiences. This is not a finding that I am making or made then; it was a jury matter. But I mean that was the opinion of this Court. I felt that—that it was a fearful gamble, a fearful gamble on the one hand for the plaintiff to come in and ask for all or nothing at all; it was a fearful gamble for the defendants not to counterclaim, at least in—in the alternative, of unjust enrichment or value as damages—"

17A. It should be pointed out that Nordin did not ask to have the theory of unjust enrichment submitted to the jury in any event.

## III

■■ Drawing another arrow from its quiver, Nordin next argues that any failure by it to substantially perform was waived by inspection and acceptance of the job under contract provisions which provided as follows:

The Architect/Engineer shall give all orders and directions contemplated under this contract and specifications relative to the execution of the work. The Architect/Engineer shall determine the amount, quality, acceptability, and fitness of the several kinds of work and materials which are to be paid for under this contract and shall decide all questions which may arise in relation to said work and the construction thereof. The Architect/Engineer's estimates and decisions shall be final and conclusive, except as herein otherwise expressly provided. In case any question shall arise between the parties hereto relative to said contract or specifications, the determination or decision of the Architect/Engineer shall be a condition precedent to the right of the Contractor to receive any money or payment for work under this contract affected in any manner or to any extent by such question.

The Architect/Engineer shall decide the meaning and intent of any portion of the specifications and of any plans or drawings where the same may be found obscure or be in dispute. Any differences or conflicts in regard to their work which may arise between the Contractor under this contract and other Contractors performing work for the Owner shall be adjusted and determined by the Architect/Engineer.

It is undisputed that both Philleo and his engineer, Freese, testified that they advised the City to accept the system with the de-

ficiencies outlined on a punch list. However, there is no indication of any acceptance by the City either in the testimony of councilmen or in City Council minutes.

In many cases the acceptance by the architect or engineer has been considered sufficient under standard contractual provisions providing that the final decision was delegated to the architect or engineer.[18] However, in the case at bar, Section 11 of the General Conditions of the contract required completion to the satisfaction of the architect/engineer *and* "the owner". Thus the agreement of the architect/engineer is simply not conclusive.[19]

Lacking direct evidence of acceptance, Nordin attempts to infer acceptance from either payment or use and occupancy. Payment of all but approximately $2,500.00 of the contract price must be weighed against Section 26 of the General Conditions of the contract which provides specifically as follows:

No payment, however, final or otherwise, shall operate to release the Contractor or his sureties from any obligation under this contract. * * *

Section 1A4 of the General Requirements of the contract further provides:

Failure on the part of the resident engineer to condemn or reject bad or inferior work or materials should not be construed to imply acceptance of such work or materials.

Finally, Section 40 of the General Conditions of the contract also provides as follows:

Neither the final certificate of payment nor any provision in the Contract Documents nor partial or entire occupancy of the premises by the Owner shall constitute an acceptance of work not done in accordance with the Contract Documents. * * *

18. City of Granville v. Kovash, Inc., 118 N.W.2d 354, 359 (N.D.1962).

19. *Id.*; Welsh v. Warren, 159 S.W. 106 (Tex.Civ.App.1913); Jenkins v. Am. Surety Co., 45 Wash. 573, 88 P. 1112, 1113 (1907); Monson v. Fischer, 118

Cal.App. 503, 5 P.2d 628 (1931); *cf.* Annot. 54 A.L.R. 1255 (1928) for cases holding that to make decisions of an architect/engineer conclusive requires plain language in the contract, and that such authority should not be inferred from general language.

Given the above provisions of the contract, it is difficult to establish acceptance by payment, or by use and occupancy.

Under the contract Nordin had the duty of proving acceptance by the City, as well as acceptance by Philleo Engineering. While the better view is that such acceptance may be inferred by determining what a reasonable person in the position of the City would have been satisfied with, it becomes a question of fact whether a reasonable man in the City's place would have been dissatisfied with the performance in this case.[20]

The question of whether a person has acted reasonably is generally a jury issue.[21] In this case, the question of acceptance was submitted to the jury under instructions 7 [22] and 9,[23] which were not objected to except insofar as they presented the issue for jury determination. Nordin asserts here, as it did with regard to the question of substantial performance, that there was simply no evidence upon which reasonable minds might differ on the question of misrepresentation by the contractor and thus acceptance had occurred as a matter of law.

While the trial court incorrectly instructed the jury that there had been acceptance, it did so on a theory urged by Nordin for which Nordin cannot now complain. The actual question in the case at bar becomes whether under the theory as used by the trial court there was evidence of misrepresentation which invalidated any acceptance by the City.

As before, we find we cannot say that reasonable minds could not differ on this question. Conflicting evidence as to performance presented competing inferences on the questions of whether there had been acceptance and whether the acceptance was invalidated by misrepresentation. Therefore, we hold that it was not error to submit the issue to the jury for determination.[24]

---

20. Shimek v. Vogel, 105 N.W.2d 677, 683 (N.D.1960); Eckert-Fair Constr. Co. v. Flabiano, 342 S.W.2d 629, 632 (Tex. Civ.App.1960); Haymore v. Levinson, 8 Utah 2d 66, 328 P.2d 307, 309 (1958); Enterprise Roofing & Sheet Metal Co. v. Howard Inv. Corp., 105 Ohio App. 502, 152 N.E.2d 807, 810 (1957); Annot., 44 A.L.R.2d 1114, 1119–1121 (1955).

21. Cf. Mallonee v. Finch, 413 P.2d 159, 161 (Alaska 1966); Crawford v. Rogers, 406 P.2d 189, 193 (Alaska 1965); McCoy v. Alaska Brick Co., 389 P.2d 1009–1010 (Alaska 1964).

22. Instruction No. 7 reads as follows:
 The plaintiff City of Nome has a burden of proving by a preponderance of evidence the following issues:
 1. That defendant Nordin Construction Company did not substantially comply with the terms of the contract and did not substantially perform the work required under the terms of the contract.
 2. That the acceptance of the work by plaintiff City of Nome or its authorized agents, if you find an acceptance, was induced by the fraud, collusion, concealment, or gross mistake, all as hereafter defined, of defendant Nordin or of the architect/engineer or of their authorized agents.

23. Instruction No. 9 reads as follows:
 Generally, on the matter of acceptance, a provision in a contract such as the one before us, which makes the architect/engineer the sole judge of the quality and acceptability of the work, is valid and binding on the parties and that the action of the engineer under such contract, approving the work and manner of performance of the contract is final and conclusive on the parties in the absence of fraud, collusion, concealment which prevents the discovery of the failure on the part of the contractor to comply with the contract terms, or such gross mistake as would imply bad faith on the part of the engineer or failure on his part to exercise honest judgment.
 For the purposes of this instruction, you are advised that fraud means a misrepresentation or concealment by the contractor as to a material noncompliance with the contract, such that the architect/engineer was misled in accepting the work.
 We do not pass on the question of whether Instructions 7 and 9 were correct statements of the law.

24. See Annot., 54 A.L.R. 1255, 1266–67 (1928); Annot., 110 A.L.R. 137, 143 (1937); Elliott Consol. School Dist. v.

## IV

Nordin raises several other specifications of error in its brief which will be discussed briefly at this point.

Nordin argues that this case should be remanded for a new trial because the court excluded evidence suggesting possible design failure of the sewer and water system. The court did exclude defendant's exhibit "L" which was a letter from Nordin's representative, Payne, to Philleo Engineering on June 24, 1964. This letter called to the attention of the engineers some possible problems concerning the design of this system.

The pleadings, however, do not contain any reference to design failure. There is no defense asserted in the answer related to design failure; nor was any issue raised at the pre-trial conference or in the pre-trial order concerning design failure. There is no reference in the examination of any of the witnesses from Philleo Engineering at the trial concerning design failure.[25] The only witness to testify on this point as an expert, James Smith, testified that if the construction had been properly done the design would have had a strong chance to succeed. There is no dispute as to this testimony which was presented by the City.[26]

Since the entire trial took place upon another theory, with no attempt made in the examination of witnesses to get to the question of design, and because there is no third party complaint against Philleo Engineering, it would appear that this issue was not properly raised below and has been

Busboom, 227 F.Supp. 858, 861–862 (D.C. Iowa 1964) ; City of Osceola v. Gjellefald Constr. Co., 225 Iowa 215, 279 N.W. 590 (1938) ; Patten v. Rodgers, 430 S.W.2d 479 (Tex.1968). It is clear that the instructions 7 and 9 were far more restrictive than necessary, and were advantageous to Nordin. We find the more persuasive legal authority supports the view that acceptance does not include acceptance of latent defects in the system.

Appellant, in its brief, cites several early California, Washington, Wisconsin and Michigan cases which hold that the certificate of the architect or engineer is conclusive as to all defects in workmanship, patent or otherwise, in the absence of fraud.

These cases are of questionable value today, as they were originally based on the doctrine of *caveat emptor*, which has, for the most part, disappeared under the impact of modern warranty law. A somewhat analogous situation appears in the present trend of tort cases to apply the doctrine of implied warranty of fitness to new house construction on behalf of the buyer against the builder (and even the financing institution in California). Weeks v. Slavik Builders, Inc., 384 Mich. 257, 181 N.W.2d 271 (1970). [See: Wawak v. Stewart, 247 Ark. 1093, 449 S.W.2d 922 (1970) ; Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399, 402 (1964) ; Bethlahmy v. Bechtel, 91 Idaho 55, 415 P.2d 698, 719 (1966) ; Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965) ; Waggoner v. Midwestern Dev., Inc., 154 N.W.2d 803 (S.D.

1967) ; Humber v. Morton, 426 S.W.2d 554 (Tex.1968) ; Rothberg v. Olenik, 262 A.2d 461 (Vt.1970) ; House v. Thornton, 76 Wash.2d 428, 457 P.2d 199, 209 (1966).] [See also Dunham, Vendor's Obligation as to Fitness of Land for a Particular Purpose, 37 Minn.L.Rev. 108 (1952) ; Bearman, Caveat Emptor in Sales of Realty—Recent Assaults Upon the Rule, 14 Vand.L.Rev. 541 (1961) ; Haskell, The Case for an Implied Warrant of Quality Sales of Real Property, 53 Geo.L.J. 633 (1965) ; Robert, The Case of the Unwary Home Buyer: The Housing Merchant Did It, 52 Cornell L.Q. 835 (1967) ; Schwartz, Defective Housing: The Fall of Caveat Emptor, 33 ATLA L.J. 122–39 (1970).]

25. One explanation for the lack of assertion of design failure is the tactical reason of attempting to insure the favorable testimony of the engineers of Philleo Engineering.

26. The letter would, of course, be hearsay if offered to prove the facts asserted therein. Nordin argues its admissibility as evidence of notice to Philleo Engineering of believed design defects. Such notice is generally required to be given the owner or the architect by the contractor where the latter has reason to believe the plans are defective, in order to protect the contractor from liability for deficiencies caused by such defects. 17A C.J.S. Contracts § 515(b) at 856; Allied Contractors v. United States, 381 F.2d 995, 180 Ct.Cl. 1057 (1967).

waived by Nordin. We, therefore, hold that it was not error to exclude the letter in evidence, for it went to an issue not raised by the pleadings or the proof.

■ Nordin also seeks a new trial because of alleged errors in law as to certain instructions.[27] The exceptions taken to the instructions below by Nordin's attorney were as follows:

> May it please the court, the defendants except to the giving of instructions 7, 8 and 11 in that all of them either present to the jury or impliedly indicate that it is up to the jury to decide whether or not the city of Nome through its authorized agents found the work of the defendant construction company acceptable. We so except on the ground that there is no evidence or reasonable inference from the evidence of any kind to the contrary and that instead the court should have instructed that the city of Nome did in fact accept the work of the defendant construction company. In other words, there is no issue of fact on the subject on which reasonable minds could differ.

I think this may be an unnecessary exception in view of the fact that it is contained in the motion in which it is still under advisement by the court, but I do make it at this time. I also except the last 11 words of es—instruction no. 10 as —in which the court asks in its final sentence, does the breach if breach be found, go substantially to the whole of the contract or does it relate itself to unsubstantial phases of the contract, * * *

Civil Rule 51(a) provides in part that "[n]o party may assign as error the giving * * * an instruction, unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Since the objections now argued by Nordin are other than to the question of sufficient evidence to support an instruction, it would appear that Nordin has waived objection as to all of the instructions requested, except as to that portion of Instruction No. 10 concerning breach of the whole contract. We have already dealt with the matter of substantial

---

27. The specific allegations of error in appellant's brief are as follows:

"16. NEW TRIAL — ARCHITECT NOT AGENT OF NORDIN. Instructions 7 and 8 (Record, file 3, pp. 574, 575) confusingly make it appear that the architect/engineer is an agent of Nordin and that Nordin would be responsible for the fraud or gross mistake of the City's agent and making it appear that the contractor is liable for faulty design and/or supervision of the City's own architect/engineer, thus constituting plain error so substantial as to result in injustice. Merrill v. Faltin, 430 P.2d 913 at 917 (Alaska 1967).

"17. NEW TRIAL — COMPLETELY UNCLEAR INSTRUCTION. Under the authority of the case cited in the preceding Argument section, we contend that instruction No. 8 (Record, file 3, p. 575) is so unclear in its entirety as to be entirely meaningless and the undefined expression 'gross mistake' thoroughly confuses the jury and could easily cause them to feel that Nordin was responsible for the design and/or supervision of the City's own agent, the architect/engineer. This reason is even more compelling when we again review the vigorous attempt at impeachment by the City of their own architect.

"18. NEW TRIAL — 'UNSUBSTANTIAL PHASES OF THE CONTRACT.' See our SPECIFICATION OF ERROR No. 11. The jury was, in effect, told that *any* substantial breach is a *total* breach, requiring total refund of all moneys paid to contractor—a principle unknown to the law. It did not permit the jury to consider the very real possibility that there might be a breach which was substantial, which was not a breach of, in the words of the instruction, 'substantially the whole contract'.

"19. NEW TRIAL — CONFUSING BURDEN OF PROOF. See SPECIFICATION OF ERROR No. 10. We have earlier pointed out that the true burden of proof is upon the plaintiff and that instruction No. 7 (Record, file 3, p. 574) correctly places the burden of proving substantial non-compliance upon the City. Now, here in instruction No. 11 (Record, file 3, p. 577), Nordin is given the burden of proving acceptance by the City 'or that it did substantially comply with the contract specifications'—an obvious conflict. Merrill v. Faltin, 430 P.2d 913 at 917 (Alaska 1967), *supra*."

failure of performance, and find no error in Instruction No. 10.

The question of agency was not raised; the question of whether the acceptance instruction properly stated the law was not raised; and no question concerning the burden of proof in fraud situations was raised.

The suggestion that these matters should be considered as plain error under the doctrine set forth in Merrill v. Faltin, 430 P.2d 913, 917 (Alaska 1967), has been considered, and we conclude that the instructions are not so plainly erroneous as to call for interference by this court.

The jury not only found for the City on its cause of action, but also awarded Nordin $190,000 for extra work performed. Nordin now argues that this verdict is so inconsistent as to require the granting of a new trial. We find no error in refusing to grant a new trial.[28]

In City of Homer v. Land's End Marine, 459 P.2d 475 (Alaska 1969), this court held that there would be a waiver of any error as to inconsistency of verdicts unless a party raised such an issue at the time the jury returned. This rule was adopted in order to enable expeditious correction of error by resubmission to the jury.[29]

Nordin cannot now be permitted to take advantage of what was probably a tactical move on its part. By silence it chose to accept the benefit of the jury verdict; it must also accept any detriment which flows therefrom.

V

After the judgment had been entered in the lower court, Nordin and its bonding company filed a motion for relief from judgment under Alaska Civil Rule 60(b).[30] The grounds alleged for such relief were a catalog of the permissible reasons stated under the rule. They included a request for relief because of (1) mistake, (2) newly discovered evidence, (3) fraud, (4) equity, and (5) any other reason not included in the other four.

The basis for the request was the alleged discovery after the judgment that the City had entered into a contract with the United States Department of Health and Welfare to construct a water and sanitation system for 200 low-cost homes which would be attached to the system over which the case arose. This evidence, together with permission to the State Department of Highways to pave one street and the main intersections thereto, were considered by Nordin positive proof of the construction adequacy of the original project.

The standard of review of the denial of a motion under Rule 60(b) is whether the trial court abused its discretion in denying the motion.[31]

In considering the effect of the evidence, the trial court noted that the contractor had continuously sought a change in venue,

---

28. It may be that no inconsistency exists between the theories of the claim and counterclaim. The City so argues.

29. Cundiff v. Washburn, 393 F.2d 505 (7th Cir. 1968); cf. Wells Truckways, Ltd. v. Burch, 247 F.2d 194 (10th Cir. 1957).

30. Rule 60(b) reads in part as follows:
On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
(1) mistake, inadvertence, surprise or excusable neglect;
(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or
(6) any other reason justifying relief from the operation of the judgment.

31. Gravel v. Alaska Village, Inc., 423 P.2d 273 (Alaska 1967); Alaska Truck Transport, Inc. v. Inter-Alaska Credit Service, Inc., 397 P.2d 618 (Alaska 1964).

over the vigorous objections of the City, and that the City had argued for a view of the premises as an aid to the jury in reaching its verdict.[32] Moreover, the Rule 60(b) motion was heard by the judge who presided at the trial. The trial court was acutely aware of the problems which were posed by the pleadings and by the positions taken by the parties. This is shown by his comments at the hearing on this motion.[33]

The court felt that the "new" evidence was not of the weighty quality suggested by Nordin and that evidence presented at trial concerning the addition of forty houses to the system and the modification of the water source was of similar import.

We are of the view that the decision of the trial judge denying the motion was within his discretion, particularly in view of our decision in Patrick v. Sedwick, 413 P.2d 169, 177–178 (Alaska 1966), holding that evidence, to be properly considered under Rule 60(b), must relate to facts which were in existence at the time of trial. If it were grounds for a new trial that facts occurring subsequent to the trial have shown an inaccurate prophecy, litigation would never come to an end.[34]

■ In supplemental materials filed with a motion for reconsideration of the trial court's denial of the motion for relief from judgment, Nordin presented copies of certain financial and engineering reports on the sewer and water system. These reports were used by the City to obtain additional financing to expand the system in 1968, some two years before trial. Nordin apparently abandoned the other grounds urged in the original motion for relief from judgment and focused solely on fraud. Nordin claims that this evidence proves that the City knew the system had some value. This, it is claimed, establishes fraud, since the City urged in this suit that the system has no value.

The answer to this contention is found in the legal stance assumed throughout these proceedings by the City. The City alleged a failure of substantial performance. This is not the same thing as alleging no value. Even if the City does concede some limited benefit from the system, the burden of proof was on Nordin to show such benefit. The City's position has been consistent throughout the pleadings and in argument. Such a position permits it to admit some limited benefit from the system while urging failure to substantially perform the contract. No fraud is inherent in the City's actions.

■ We thus do not find that the facts, as asserted, establish fraud. We additionally feel obliged to comment that these financial and engineering reports were discoverable by Nordin prior to trial. No explanation is advanced for the failure to discover such evidence prior to the time presented herein. We, therefore, deem any

---

32. Stuart Oles, in his affidavit of March 8, 1969, in support of his second motion for change of venue, stated that no view of the premises should be allowed and took issue with the portion of the decision rendered by Judge Sanders on October 7, 1966, in denying the original motion for change of venue because a view would be beneficial to the jurors. In answer to the second motion for change of venue, the City requested a view of the sewer and water system by the jury. The court denied this motion for change of venue on the basis of the earlier ruling, but did not reach any decision on the request for a view of the premises. A third motion for change of venue was filed on August 26, 1969, and the position of the parties was unchanged. The court granted this motion and subsequently the parties stipulated that trial be held in Anchorage, Alaska.

The argument now made by Nordin that the "new evidence" showed deliberate concealment by the City and that such evidence of new additions to the system was not discoverable by Nordin before the trial is clearly inconsistent with its previous position in this case. The trial court could properly consider such a position in considering the motion for relief from judgment.

33. See note 17, supra.

34. 3 Barron & Holtzoff, Federal Practice & Procedure § 1305 at 371 (Wright rev. 1958); 6A Moore Federal Practice § 59.08 [3] at 3784 (1966); Patrick v. Sedwick, 413 P.2d 169, 177 (Alaska 1966).

claim of newly-discovered evidence clearly inapplicable.[35]

### VI

■ The City in its cross appeal has asserted that the trial court erred in refusing to award it pre-judgment interest and costs. We agree.

The City requested interest from December 4, 1965, the date of the last progress payment. At that time Nordin represented that all work under the contract had been performed. Since the City's cause of action had then accrued, pre-judgment interest should have been awarded unless for some reason, which we do not find, such an award would do an injustice. Fairbanks Builders Inc. v. Morton DeLima, Inc., 483 P.2d 194, 195 (Alaska 1971); State v. Phillips, 470 P.2d 266, 274 (Alaska 1970).

The trial court refused to grant costs to the City on the ground that since both parties prevailed[36] as to their claims the City was not entitled to costs. We find that a far too restrictive a reading of Civil Rule 54(d).[37] A simple balancing of the recovery in favor of each party makes it clear that the City was the prevailing party in this lawsuit[38] and should have been awarded costs.

The judgment in favor of the City is affirmed with directions that it be modified to reflect the additional award of interest and costs in conformity with this opinion.

RABINOWITZ, J., not participating.

### ON PETITION FOR REHEARING

In its petition for rehearing, Nordin asserts that it was denied the opportunity of filing a reply brief and presenting oral argument in case number 1520. It also argues that the issue of unjust enrichment was not raised on appeal in case number 1290; for this reason it is claimed that we erred in discussing this issue in the opinion filed in this case.

■ The record discloses that case 1520 was consolidated with cases 1290 and 1299 for opinion by an order which we entered on June 24, 1971. This order, dated some three and one-half months after oral argument, was entered at the request of Nordin. The order specifically provided that no further oral argument would be heard by us. Nordin's arguments in case 1520 were fully considered in reaching our decision, for we had a separate record prepared in case 1520 which consisted of a transcript of all oral arguments and all written papers presented to the trial court. Additionally, we considered Nordin's and the City of Nome's briefs. These did not depart from the position taken in the trial court by each party.

In case number 1290 the record and briefs disclose that the issue of unjust enrichment was raised in the statement of points on appeal and in the briefs of Nordin and the City of Nome. The issue of unjust enrichment as a basis for reversal was raised at page 55 of Nordin's brief. This argument was answered by the City of Nome on pages 25–30 of its brief, and was treated further in the reply brief of Nordin on pages 8–11.

It is hereby ordered that the Petition for Rehearing is denied.

---

35. Montgomery Ward v. Thomas, 394 P.2d 774, 775–776 (Alaska 1964). The City attempted to introduce evidence at the trial concerning the revenue bonds on the system, but all such evidence was excluded on objection of Nordin. The position now taken by Nordin is inconsistent with its previous position and our review could be limited on that basis. See Merl F. Thomas Sons, Inc. v. State, 396 P.2d 76, 79–80 (Alaska 1964); Mitchell v. Knight, 394 P.2d 892, 897 (Alaska 1964).

36. The City recovered all the money paid to Nordin ($1,351,335.60) and Nordin recovered $173,000.00 on its counterclaim for extra work.

37. Civil Rule 54(d) provides in part:
Except when express provision therefor is made either in a statute of the state or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs.

38. 6 Moore, Federal Practice § 54.70 [4] at 1305 (1966); cf., Buza v. Columbia Lumber Co., 395 P.2d 511, 513 (Alaska 1964).